828 F.2d 961
 127 L.R.R.M. (BNA) 3018, 107 Lab.Cas. P 10,204
 Robert L. JOHNSON, Keith A. Smith, Richard E. Davis, Ann
McFadden, Wanda M. Anderson, and All Others
Similarly Situated, Appellants,
v.
UNITED FOOD AND COMMERCIAL WORKERS, INTERNATIONAL UNION
LOCAL NO. 23, Formerly Local No. 590; Jack Draper; Richard
J. Lutz; United Food and Commercial Workers International
Union, A.F.L.-C.I.O., C.L.C.; Alan Lee; and the Great
Atlantic & Pacific Tea Company, Appellees.
 No. 86-3781.
 United States Court of Appeals,
Third Circuit.
 Submitted Pursuant To Third Circuit Rule 12(6) June 22, 1987.
Decided Sept. 17, 1987.
 
 Michael D. Buchwach, Specter & Buchwach, P.C., Pittsburgh, Keith M. Pemrick, Dale, Woodward, Montgomery & White, Franklin, Pa., for appellants.
 Leonard L. Scheinholtz, William Bevan III, Robert F. Prorok, David J. McAllister, Reed Smith Shaw & McClay, Pittsburgh, Pa., for The Great Atlantic & Pacific Tea Co., Inc.
 Richard Roesel, Peter J. Ford, United Food & Commercial Workers Intern. Union, Washington, D.C., Joseph M. Maurizi, Maurizi & Cutruzzula, Pittsburgh, Pa., for the Union appellees.
 Before GIBBONS, Chief Judge, and WEIS and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this appeal plaintiff employees contend that they are not bound by an arbitrator's unfavorable decision, despite their union's voluntary submission of a dispute to him. We conclude that the union had authority to arbitrate the question of the existence of a collective bargaining agreement even though the matter could have been litigated. We also decide that individual employees may not rely on representations which were made by the employer during collective bargaining but never incorporated into a valid labor contract. We therefore will affirm the dismissal of the plaintiffs' complaint.
 
 
 2
 Various facets of the dispute underlying this case have been before us on earlier occasions. Thus, we summarize the facts briefly for background purposes.
 
 
 3
 A collective bargaining agreement between The Great Atlantic & Pacific Tea Company and Local 590, now Local 23, covered the employees in seventy-seven A & P stores in western Pennsylvania, Maryland and West Virginia. This contract, signed in 1977, was to expire on September 27, 1980.
 
 
 4
 Beginning in June, 1980, A & P and the union tried without success to negotiate a new agreement. The September 27 deadline passed, but by its terms the 1977-80 provisions continued in force during the negotiations. On October 23, 1980, the negotiators seemingly had reached a resolution. They memorialized their agreement the next day in a hand-written memorandum signed by company and union representatives. The parties apparently intended to integrate the memorandum's twenty-four points with the 1977-80 agreement at some future date.
 
 
 5
 Several months later, company and union representatives reworked the 1977-80 agreement to reflect the memorandum's modifications. Local 590 officials signed the new three-year draft on May 27, 1981. The union membership, relying on representations made by the officers, then ratified the document. Senior officials at A & P, however, refused to sign the new contract, asserting that it did not accurately reflect the 1980 memorandum agreement.
 
 
 6
 Between the negotiation of the memorandum in 1980 and the company's refusal to execute the proposed 1980-83 draft, A & P had shifted several full-time employees to part-time status. The union protested this action, arguing that the employer was bound by the terms of the 1977-80 agreement as continued in the 1980-83 proposed contract. These terms provided that A & P would combine part-time positions to create as many full-time positions as possible. The company insisted that the memorandum had specifically eliminated the pertinent clause and contended that it should not have been included in the 1980-83 draft.
 
 
 7
 Local 590 moved for arbitration. A & P initially objected on the grounds that no contract was then in force, but finally agreed to arbitrate the single question of whether a collective bargaining agreement had existed during the grievance period. After taking testimony, the arbitrator issued a comprehensive opinion that no collective bargaining agreement had existed between the parties after October 23, 1980.
 
 
 8
 The local next filed suit in the district court. In United Food and Commercial Workers Int'l Union, Local 590 v. Great Atlantic & Pacific Tea Co., 734 F.2d 455 (3d Cir.1984), we affirmed the district court's refusal to modify the arbitrator's decision.
 
 
 9
 In a related case, the trustees of the multi-employer welfare benefit fund covering A & P employees sued the company to recover payments due under the collective bargaining agreement. Because the fund had not been a party to the initial arbitration proceeding, we determined that collateral estoppel did not bar the trustees from enforcing their claims under the collective bargaining agreement. Moldovan v. Great Atlantic & Pacific Tea Co., 790 F.2d 894 (3d Cir.1986).
 
 
 10
 The proceeding now before us began as a suit in the state court by the named plaintiffs, former employees of A & P and members of Local 590. Defendants are the local and international unions, the president and secretary of the local union, the vice-president of the international union, and the employer, Atlantic & Pacific Tea Company.
 
 
 11
 Plaintiffs alleged on behalf of themselves and a class composed of similarly situated former employees that they were entitled to severance pay and sought recovery from defendants on various theories. The counts against the local union included negligence in failing to negotiate a collective bargaining agreement, fraud, failure to perform its duties under the union constitution, violation of the duty of fair representation and estoppel. Similar charges were brought against the international, as well as allegations of negligent supervision of Local 590. The individual union officers were accused of negligence, fraud, and breach of their duties under the union constitution.
 
 
 12
 The counts against the company rested on theories of "unwritten or defacto contract" and estoppel to deny the existence of a contract. The charges also included claims under the Pennsylvania Wage Payment and Collection law. Defendants removed the case to the federal court.
 
 
 13
 The district court determined that the plaintiffs' claims against A & P were controlled by the agreement, or the lack of one, between the company and the union. Because that issue had been determined by arbitration and the court's refusal to set aside the award, principles of res judicata and collateral estoppel prevented plaintiffs from relitigating the matter.
 
 
 14
 The court characterized the claims against the union officers as asserting violations of the duty of fair representation. That obligation arises under federal law, which preempts state law, and the claim is governed by a six-month statute of limitations. The counts here, not filed until three years later, were thus time barred. Accordingly, the district court dismissed the complaints with prejudice.
 
 
 15
 On appeal, plaintiffs contend that A & P's severance pay obligation arose from the company's direct promises to the employees and its course of conduct, including acceptance of the benefit derived from the former employees' labor. Plaintiffs also assert that federal law did not preempt their claims against the unions and their officers, which existed independently of any collective bargaining agreement.
 
 I.
 
 16
 Before 1980, plaintiffs, who were members of Local 590, were governed by the terms of the collective bargaining agreement then in effect. Although arbitration determined that no contract existed after October 23, 1980, its absence did not deprive Local 590 of the status as bargaining representative of the A & P employees.
 
 
 17
 Plaintiffs contend they are entitled to severance pay. That claim necessarily rests on language in both the memorandum of understanding and the 1980-83 draft, which substituted severance pay for job security. Indeed, the plaintiffs' complaint leaves no room for doubt on this score because the itemization of damages mirrors the severance pay provision in the memorandum of understanding. No matter how plaintiffs attempt to plead their cause of action, they ultimately must return to the terms of the memorandum of understanding and the 1980-83 draft.
 
 
 18
 Any arguments about the validity and enforceability of the memorandum of understanding or the 1980-83 draft are foreclosed by our previous holding in United Food and Commercial Workers Int'l Union, Local 590 v. Great Atlantic & Pacific Tea Co., 734 F.2d 455. There we quoted from the arbitrator's decision: "[a]ny grievances that are predicated either, upon the draft of the proposed 1980-83 Labor Agreement, or on the 1977-80 Labor Agreement, concerning events that occurred after October 23, 1980, are not arbitrable because no valid Labor Agreement exists under which the propriety of the Company's actions can be measured." Id. at 457 n. 2. The arbitrator also held that the memorandum of understanding did not constitute a binding contract.
 
 
 19
 The question then is whether plaintiffs here are bound by the arbitrator's decision. In Adams v. Gould, Inc., 687 F.2d 27 (3d Cir.1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 348 (1983), we held that arbitration awards bind not only the union, but all employees represented by it. See also United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 62-63 n. 4, 101 S.Ct. 1559, 1564 n. 4, 67 L.Ed.2d 732 (1981) ("[A]n arbitration award stands between the employee and any relief which may be awarded against the company.") See also Griesmann v. Chemical Leaman Tank Lines, Inc., 776 F.2d 66, 73 n. 11 (3d Cir.1985), citing Teamsters Local Union No. 764 v. J.H. Merritt and Co., 770 F.2d 40 (3d Cir.1985); Panza v. Armco Steel Corp., 316 F.2d 69 (3d Cir.) (per curiam), cert. denied, 375 U.S. 897, 84 S.Ct. 174, 11 L.Ed.2d 125 (1963).
 
 
 20
 In each of these cases, the arbitration award was the culmination of a process provided by a collective bargaining agreement. In the case before us, however, the dispute submitted to the arbitrator was not one within the terms of the collective bargaining agreement, but went to the very existence of that contract. Although the union asserted the grievance arose from the labor contract, the employer denied that any agreement existed and initially objected to arbitration on that ground.
 
 
 21
 In AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, ----, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), the Court restated the longstanding rule that the question of arbitrability is "undeniably an issue for judicial determination." Earlier the Court had said, "[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty." John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964).
 
 
 22
 Without question the union and the employer were entitled to a judicial decision on the issue of arbitrability. Yet, we have no doubt that both parties could voluntarily decide, as they did here, to resort to binding arbitration as an alternative form of dispute resolution. Because an arbitrator's jurisdiction is rooted in the agreement of the parties, they may agree to submit even the question of arbitrability to an arbitrator. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583 n. 7, 80 S.Ct. 1347, 1353 n. 7, 4 L.Ed.2d 1409 (1960); George Day Constr. Co. v. United Bhd. of Carpenters and Joiners of America, Local 354, 722 F.2d 1471, 1474-75 (9th Cir.1984). In general, a question ordinarily reserved for the courts may be submitted instead to binding arbitration if the parties consent. Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1, 611 F.2d 580, 584 (5th Cir.1980).
 
 
 23
 Once the parties have referred the matter to an arbitrator they are bound by his decision, Teamsters Local Union No. 764, 770 F.2d at 40, and may not later challenge his authority to resolve the dispute. Jones Dairy Farm v. Local No. P-1236, 760 F.2d 173, 175 (7th Cir.), cert. denied, 474 U.S. 845, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985); Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 382 (3d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982).
 
 
 24
 The parties, therefore, define the issues and empower the arbitrator. International Chem. Workers Union, Local No. 566 v. Mobay Chem. Corp., 755 F.2d 1107, 1110 (4th Cir.1985); R. Gorman, Basic Text on Labor Law Unionization and Collective Bargaining 586 (1976). The arbitrator's ultimate authority is not limited to the issues the collective bargaining agreement requires to be submitted, but expands to include those issues that the parties agree to submit. Piggly Wiggly, 611 F.2d at 584.
 
 
 25
 Plaintiffs rely on our statement in Moldovan that when the dispute is not over the terms of a collective bargaining agreement, but over its existence, "members of the bargaining unit are entitled to a judicial resolution of the question." 790 F.2d at 897. That observation, however, must be read in context. The statement does not indicate a dichotomy of interest between the union and its members; but rather, it reiterates the principle that arbitrability is an issue for the courts. In each case the court cited as support for the proposition, the parties were the unions and not individual members.
 
 
 26
 The Moldovan opinion further commented that it was not clear whether the union's decision to arbitrate was binding on the members of the bargaining unit, but assumed arguendo they were bound. The court concluded that, in any event, the trustees of the pension fund were not members of the bargaining unit and hence were not within the reach of the arbitrator's decision.
 
 
 27
 The question raised in Moldovan, but not necessary for its decision, is presented for resolution here. Are individual union members governed by the results of arbitration when the dispute is not within the grievance procedure of a collective bargaining agreement, but is voluntarily submitted to arbitration by the union officials?
 
 
 28
 A union's duty to its membership includes more than mere negotiations leading to a collective bargaining agreement. The union also has the obligation to represent its members in grievances and to enforce the contract. Concomitant to its administration of the agreement, a union may be required to resort to the courts. Although not integral to the bargaining process, litigation surely is a part of the union's duty to compel compliance with the agreement for the benefit of its members.
 
 
 29
 Undoubtedly, the union possessed the authority to seek a judicial determination about the existence of the contract and to bind the members of the bargaining unit to the resulting judgment. The real issue, then, is whether the union also has the power to submit such a disagreement to arbitration, another dispute resolution method. We are persuaded that the union has such authority.
 
 
 30
 Early in the history of the common law, arbitration was not regarded favorably by the courts. That attitude, however, has since undergone radical revision. The Steelworkers Trilogy[1] gave a ringing endorsement to the arbitration of labor disputes. Today, that philosophy is so deeply imbedded in labor law, that the Court construed the Norris-LaGuardia Act to allow an injunction against a union compelling it to arbitrate. Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).
 
 
 31
 The Court has not confined its acceptance of arbitration to the field of labor law. In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), an antitrust case arising out of international commercial transactions, the court said, "potential complexity should not suffice to ward off arbitration." Id. at 633, 105 S.Ct. at 3357.
 
 
 32
 In the same vein, the Court enforced an agreement in Shearson/American Express, Inc. v. McMahon, --- U.S. ----, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), requiring a brokerage firm and its customer to arbitrate a claim under section 10(b) of the Securities Exchange Act. Distinguishing almost to extinction an earlier case under the Exchange Act, Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Court observed, "mistrust of arbitration that formed the basis for the Wilko opinion in 1953 is difficult to square with the assessment of arbitration that has prevailed since that time." Id. at 2341. Similarly, in the McMahon case, the Court also permitted arbitration to decide claims under RICO. Cf. Moses H. Cone Memorial Hosp. v. Mercury Constr. Co., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, reh'g denied, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974).
 
 
 33
 Any doubts existing before The Steelworkers Trilogy about the use of arbitration in labor disputes have surely vanished by this time. No valid objections remain to a union's decision to arbitrate a dispute rather than resort to the court. In some circumstances, that choice may be obviously beneficial to the membership. In other situations the advantages, or lack of them, may be perceived only in retrospect, but nothing in federal law would bar the union leadership from exercising its discretion. The expedition of the grievance process and the use of an arbitrator steeped in labor law are unquestionably factors that responsible union leaders may freely consider in deciding how best to resolve a dispute with an employer.
 
 
 34
 The claim here differs substantially from those considered in Barrentine v. Arkansas-Best Freight System, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In those cases, the Court observed that the employees had asserted rights grounded in specific statutory provisions designed to provide minimum substantive guarantees to individual workers. Here, the claims are based on allegations of obligations incurred by an employer through contract, implied contract or estoppel, rather than any statutory entitlement. The legislative concerns underlying Barrentine and Gardner-Denver are not present here.
 
 
 35
 We conclude, therefore, that a union does not exceed its authority by submitting the issue of arbitrability to voluntary arbitration instead of demanding resolution by a court. Because the arbitration procedure is permissible, it follows that individual union members are bound by the outcome to the same extent as when the dispute arises as a grievance within the provisions of a collective bargaining agreement. Thus, plaintiffs may not challenge the arbitrator's decision that no binding contract existed after October 23, 1980, and claims based on the theory of an enforceable agreement cannot succeed.
 
 II.
 
 36
 Plaintiffs here struggle to escape the arbitration decision by arguing that their claims stem from promises made by the company, not from provisions in the memorandum of understanding or in the 1980-83 draft. As the district court pointed out, however, these promises were not communicated to plaintiffs personally or individually, but to the bargaining unit represented by the union in the negotiations. The fact that the union may have misrepresented the company's position to its membership during the collective bargaining process does not bind A & P to an enforceable contract.
 
 
 37
 To accept the plaintiffs' contentions would severely undercut the national labor policy of encouraging and enforcing collective bargaining by representatives selected by the employees. Effective representation requires that the employer negotiate with the union and not bypass orderly procedures through direct appeals to the membership. See NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967) (National labor policy extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.); Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683-84, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944) (Orderly collective bargaining requires that the employer not be permitted to go behind the designated representatives in order to bargain with the employees themselves.). We find the plaintiffs' arguments unconvincing.
 
 III.
 
 38
 An exception to the binding effect of the union's arbitration of an employee's grievance applies when the employee can establish a breach of the union's duty of fair representation. He may then recover in a Sec. 301 suit against the employer on a breach of contract claim and against the union for a violation of the duty of fair representation. These actions are commonly termed "hybrid" section 301 suits. See Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 
 39
 In reviewing the plaintiffs' complaint against the union officers here, the district court concluded that the allegations of negligence and fraud were essentially claims that the unions and their officers had violated their duty of fair representation. We find no error in that characterization and reject the plaintiffs' attempt to cast the allegations as state tort claims not preempted by federal law. The duty of fair representation is imposed by federal statute, and federal law applies whether the section 301 suit is brought in federal or state court. Id. at 174, 87 S.Ct. at 908.
 
 
 40
 The Supreme Court has made it clear that one cannot avoid federal preemption of alleged state law claims by artfully phrasing the language in the complaint. "It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern." Amalgamated Ass'n of Street Electric Ry & Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 292, 91 S.Ct. 1909, 1920, 29 L.Ed.2d 473 (1971); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).
 
 
 41
 An action for breach of the duty of fair representation must be brought within six months of the time of the incident. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). See also Clift v. International Union, 818 F.2d 623 (7th Cir.1987). Even if the breach did not occur until May, 1984, when we decided that the arbitrator's decision was binding, the statute of limitations expired before the present suit was filed in August, 1985. Consequently, the claims against the union and their officers were untimely, and the district court's judgment on that ground must be sustained.[2]
 
 
 42
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)
 
 
 [2]
 In their complaint, plaintiffs also allege that the union officers violated their obligations under the union constitution. We have held that the six-month statute of limitations applies to claims of that nature as well. Lewis v. International Bhd. of Teamsters, 826 F.2d 1310 (3d Cir. 1987)